# EXHIBIT B



Reed Smith LLP
355 South Grand Avenue
Suite 2900
Los Angeles, CA 90071-1514
Tel +1 213 457 8000
Fax +1 213 457 8080
reedsmith.com

**Richard C. Giller**
Direct Phone: +1 213 457 8028
Email: rgiller@reedsmith.com

October 16, 2017

**Via Email [joan@cochranlaw1.com]**

Joan Cochran, Esq.
Cochran, Davis & Associates, P.C.
33 Malaga Cove Plaza
Palos Verdes Estates, CA 90274

| **Re:** | **Insured:** | **Stuart & Annette Rubin** |
|---|---|---|
| | **Certificate No:** | **SRD526993** |
| | **Claim No.:** | **1798204** |
| | **Your File No.:** | **379,054** |

Dear Ms. Cochran:

As I advised you on the telephone last week, the undersigned has been retained by Stuart and Annette Rubin (the "Rubins") to serve as insurance coverage counsel in connection with the above-referenced claim. Accordingly, please direct all future communications concerning this matter to my attention.

The purpose of this letter is to respond to your 25-page letter dated June 14, 2017, sent on behalf of Certain Underwriters at Lloyd's, London ("Underwriters") subscribing to the HO-3 Policy bearing Certificate Number SRD526993 covering the periods May 25, 2015 to May 25, 2016 and the renewal of that policy for the period May 25, 2016 to May 25, 2017 (collectively referred to herein simply as the "Subject Policy"). As discussed more fully below, coverage exists under Section I ("Perils Insured Against"), Coverage C ("Personal Property"), Item 9 (a) of the Subject Policy because, based upon the totality of the circumstances, a jury could reasonably conclude that the most likely explanation as to how and why Custom Design Storage, Inc. ("CDS") failed to deliver to the Rubins over 150 brand new and/or one-of-a-kind pieces of furniture, artwork, fabric, exercise equipment, pillows and bedding (all of which was shipped directly to CDS from vendors and/or picked up by CDS and stored at CDS for several years), is because CDS fraudulently misappropriated that property and either sold or traded the items for cash to cover or absolve its mounting debt, in an attempt to salvage a failing business.

Indeed, theft is a far more likely explanation regarding the cause of this loss than the "explanation" offered by Underwrites; *i.e.*, hundreds or thousands of pounds of personal property either mysteriously vanished into thin air or they were simply misplaced or lost by CDS, never to be found again. As a result, the Subject Policy clearly provides coverage for 100% of the value of the items stolen without depreciation and, therefore we hereby request that Underwriters immediately acknowledge coverage for this loss and pay to the Rubins the value of their property as soon as possible.

ABU DHABI ♦ ATHENS ♦ BEIJING ♦ CENTURY CITY ♦ CHICAGO ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG ♦ HOUSTON ♦ KAZAKHSTAN ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH
NEW YORK ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH ♦ PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

Exhibit B - Page 73

## I. INTRODUCTION

By its June 14 letter, Underwriters purport to reserve the right to deny coverage for the Rubins' claim. However, a closer review of that correspondence reveals that the "reservation of rights" is tantamount to an outright denial of coverage and it will be treated as such. This is because Underwriters unreasonably failed to view the testimony and documentary evidence submitted by the Rubins in the light most favorable to providing coverage for the loss, as Underwriters are required to do. Instead, Underwriters improperly viewed the evidence solely through the lens of creating an artifice for denying coverage.

The one-sided and unreasonable nature of Underwriters' review of the evidence in this case is confirmed by the fact that the vast majority Underwriters' June 14 letter only recites those facts and allegations that Underwriters contend support a denial of coverage while Underwriters completely ignore all of the facts supporting coverage under the subject policy. The clear intent of Underwriters' June 14 letter is to deny coverage outright, rather than simply reserving the right to do so and this intente is found throughout that correspondence including, among others, in the following passages:

- "Underwriters reserve the right to deny coverage because the specified peril of **Theft** ***does not exist*** based upon the allegations of the Complaint and the discovery provided to date, including the depositions of John [sic, James] Deely of CDS and Annette Rubin."

- Underwriters "reserve the right to deny coverage under the terms of the policy and the evidence evaluated to date as these facts ***do not amount to*** **Theft** as interpreted by the *Barnett* case."

- "Underwriters reserve the right to deny coverage ***because … conversion is [not] the same as the specified peril of Theft under the Policy***. Neither tort requires a criminal intent in the initial taking as does the **Theft** peril. Neither tort requires intent to permanently deprive as does the **Theft** peril."

Despite the notation that Underwriters are reserving its right to later deny coverage, the definitive nature of these proclamations reveal that Underwriters' analysis is based on a biased and warped analysis of the facts and allegations presented to them, slanted in a way as to seek to avoid coverage. As a result, the June 14 letter constitutes an outright, and wrongful, denial of coverage. We review below the facts and corresponding conclusions that Underwriters ignored.

## II. THE TOTALITY OF THE CIRCUMSTANCES HERE ESTABLISHES THAT "THEFT" IS THE MOST LIKELY CAUSE OF THE LOSS

The Subject Policy provides coverage for "named perils" including protection under the personal property coverage section for losses caused by "theft," a term that Underwriters failed to

define anywhere in the Policy. The theft coverage also includes losses resulting from "attempted theft **and** loss of property from a known place ***when it is likely that the property has been stolen***." *See* Section B, Item 9 (a). Pursuant to the express language of the insuring agreement extends to (1) actual theft; (2) attempted theft; and (3) circumstances where the cause is unknown but it is "likely" that the property has been stolen.

Here, the totality of the circumstances include the following facts that Underwriters completely ignore: (1) the poor financial condition of CDS, (2) the fact that CDS was in dire need of money, (3) the undisputed evidence that CDS stole money from the Rubins by charging amounts without proper authorization, and (4) the size, volume, new condition and value of the items CDS failed to deliver. All of these facts support the conclusion that the items "did not mysteriously disappear, but [were] more than likely stolen. Large expensive items do not logically disappear into thin air without explanation as to what happened; rather, large, expensive items are more likely stolen." *Libralter Plastics, Inc. v. Chubb Group of Ins. Cos.*, 199 Mich.App. 482, 502 N.W.2d 742 (1993). Here, the evidence is more than sufficient to allow a jury to draw the reasonable inference that the loss of hundreds, or thousands, of pounds of expensive, custom, high-end, brand new or one-of-a-kind items was because CDS stole that property and either sold it off for cash or exchanged it with debtors in an attempt to absolve its mounting business debt. In fact, a jury is far more likely to conclude that "theft" was the cause of the loss as opposed to any other explanation.

On June 1, 2017, the Rubin's provided Underwriters with a 30-page chart listing 167 items that CDS stored but failed to deliver to the Rubins or were damaged while in CDS' care and custody. These brand new items were delivered directly to CDS from vendors and/or picked up directly by CDS and, among the items that were never delivered to the Rubins, or damaged beyond repair included, among others, the following:

- a large 8-piece sectional sofa measuring over 18-feet in combined width;
- multiple lounge chairs, club chairs, wing chairs, dining room chairs and chaise lounges;
- a day bed and a custom biplane airplane bed;
- several large armoires, dressers, chest of drawers, ottomans, cocktail tables, desks, a bar cabinet and an archipenko cabinet with drawers;
- multiple pieces of exercise equipment including, among others, a 400+ pound, full-sized, 7-foot long, 5½-foot tall, 2½-foot wide, life fitness cross-trainer machine;
- multiple bolts of brand new and expensive fabrics;
- dozens of framed pieces of artwork, cartoon cels, and sports memorabilia; and
- numerous pillows, throws, comforters, and other bedding.

These items were among the hundreds of items stored by CDS in 29 vaults, each measuring 7-feet by 5-feet and eight feet in height, as well as the ones stored by CDS on numerous rack shelving. (*See* James Deely depo. at 71:1-8.)

Theft is a far more likely cause of the loss of all of these items than the alternative explanation that hundreds/thousands of pounds of personal property was simply been misplaced, lost or disappeared into thin air without any explanation purportedly because of the CDS' shoddy business practices. Such

a position is not only facially absurd and contrary to the language of the Subject Policy, it is also directly contradicted by the myriad of facts that Underwriters choose to ignore and gloss over. If, as Underwriters contend, the items had simply been misplaced by CDS, then a more thorough search of all of the vaults and storage units at the CDS facilities would have logically uncovered the "lost" items. But, of course, none of the items that supposedly disappeared have ever re-appeared nor have they ever been located by CDS even after a search of all of their facilities and even after being sued by Annette Rubin for the return of the property.

As a result, a jury could reasonably conclude that theft is the most likely reason underlying the demise of the 150+ items stored by CDS rather than having simply misplaced enough furnishings to decorate a three-bedroom home. The reasons underlying the theft of the Rubin's property were discussed in multiple places during the deposition of Stuart Rubin; *i.e.*, sworn testimony that Underwriters shockingly and completely ignored:

> "Q. [BY MR. MULLIS]: **Do you have any belief that CDS sold anything that was yours**?
>
> A. [BY MR. RUBIN]: **It's crossed my mind**.
>
> Q. Okay. Do you have any reason to form that belief, or what cause you to take that perspective?
>
> A. 'Cause the inventory list is so vast, how can they [CDS] not come up with the pieces or the explanations? **So either [CDS] had one massive bonfire or that inventory disappeared someplace**."

(Stuart Rubin Depo. at 45:3-11; emphasis added.)

For the eight-year period between 2007 and 2015, Stuart and Annette Rubin faithfully and timely paid to CDS nearly $200,000 in storage fees on a monthly basis. They were, in all likelihood, one of CDS' most faithful and loyal customers during that time period. In approximately May 2015, Annette Rubin telephoned CDS to request that the storage company allow her access to the belongings in anticipation of having those items removed from storage and delivered to the Rubins. The minute the steady income-stream the Rubins had been providing and CDS had enjoyed for eight years was in danger of ending, CDS began a systematic campaign to delay and stall the inevitable end of the storage facility/customer relationship. In hindsight, CDS' stall tactics were obviously a feeble attempt to continue bilking the Rubins for storage fees and/or an attempt to forestall the inevitable discovery of CDS' theft of the property. Either way, the loss is fully covered under the Subject Policy.

Months after Annette Rubin first began seeking the return of the furnishings Stuart Rubin received a call in October 2015 from Glen Posey, one of the owners of CDS and someone with whom neither Mr. nor Mrs. Rubin had ever dealt with before. After months of unsuccessful attempts by Mrs. Rubin to secure delivery of every item stored in the 29+ vaults and shelving, and at a time when CDS was fully aware it no longer possessed all of those items entrusted to the storage company, Mr. Posey demanded payment of $7,500 in storage fees. Mr. Rubin vigorously disputed that any additional fees

- [BY MR. RUBIN]: "He said that he's being priced out of the market, he had to move, he can't afford to stay here any longer. And he asked us if we have any warehouse real estate that he could look at and that he needs to find another space." (*Id.* at 38:6-11; emphasis added);

When asked if CDS acted intentionally and with oppression, Stuart Rubin answered yes and used the following example of to support the existence of such conduct: "When he called me up and said he needed the money, otherwise he wasn't going to release my inventory, and I had no choice." (*Id.* at 49:4-14; emphasis added.) Mr. Rubin went on to describe the conduct as the equivalent of a "shake down" by CDS. (*Id.* at 49:16-18.)

Annette Rubin also discussed CDS' woeful financial condition as described to her by James Deely (sometimes referred to as J.D.), one of the other owners of CDS, in connection with repeated requests by CDS to delay access to the multiple vaults purportedly holding the Rubin's furniture:

> [BY MS. RUBIN]: "He [Deely] was telling me that he was reorganizing the entire facility, because he had to -- he had lost his lease or he was moving, in the same period of time that he was having a personal loss and a tragedy. He also was having to deal with a new location, new facility, new permits, new, you know, real estate people and leases." (Annette Rubin Depo. at 80:23 to 81:4; emphasis added.)

These issues are also described in the complaint filed by Annette Rubin against CDS, James Deely and Glen Posey: "CDS had lost its lease and was preparing to move to a new location by the end of 2015." (Compl. at ¶ 13; emphasis added.) Again, Underwriters chose to simply ignore this allegation and all of the supporting deposition testimony which helps explain the loss.

Beginning in May 2015, Annette Rubin began telephoning and texting Mr. Deely on a regular basis, sometimes multiple times daily, in an attempt to arrange a time to pick up the items stored at CDS, all to no avail. At some point, Mrs. Rubin received a call from a man who identified himself as Glen who as an accountant or partner in CDS. Glen requested additional time to deliver the stored items because:

> [BY MRS. RUBIN]: "J.D. [James Deely] had suffered a terrible loss. That he had a wife who had been fighting a terrible illness for many, many months. That J.D. was essentially -- the term he uses, missing in action. That he was overwhelmed. His wife had died and that this had been a very long process. I felt very bad about that." (Annette Rubin Depo. at 65:12-18.)

With respect to the conversion claims set out in Mrs. Rubin's Complaint against CDS, Deely and Posey, Mrs. Rubin alleged:

- CDS, Deely and Posey "converted Plaintiff's furniture to their own dominion and control by refusing to return the items to Plaintiff, despite Plaintiff's repeated requests thereof." (Compl. at ¶ 21; emphasis added); and

- "By converting Plaintiff's furniture, as herein alleged, [CDS, Deely and Posey] have engaged in despicable conduct carried on with a willful and conscious disregard for Plaintiff's rights...." (Compl. at ¶ 23; emphasis added.)

Additionally, in sworn interrogatory responses, Mrs. Rubin indicated that she was seeking damages for, among other things, "the loss of use of the furniture for the period of time Defendants wrongfully retained possession of the property." (Plaintiff's Amended Responses to Form Interrogatories, Response to Interrogatory No. 9.1; emphasis added.) As discussed more fully below, these allegations constitute a "theft" as defined under California law.

## III. CDS ACTED IN A MANNER THAT CONSTITUTES "THEFT" UNDER CALIFORNIA PENAL CODE §484 (a)

The evidence regarding how and why CDS failed to deliver over 150 items to the Rubins fall squarely within the definition of "theft" as broadly defined by California Penal Code §484(a) which includes:

> "Every person who ... shall fraudulently appropriate property which has been entrusted to him or her, or who ... by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

Interestingly, this is the same Penal Code section relied upon by the court in *Barnett v. State Farm Gen'l Ins. Co.,* 200 Cal.App.4th 536, 543 (2011), the only case cited by Underwriters in its June 14 letter. The definition of "theft" set out in Penal Code §484(a) also runs contrary to Underwriter's current claim that "the Theft peril exists only where the third party (1) has the intent to steal upon the initial taking of the property and (2) has the criminal intent to permanently and unlawfully deprive the insured of his or her personal property." No such requirement is found anywhere in Section 484(a).

As set out in Annette Rubin's complaint, and as the evidence supports, CDS, Deely and Posey wrongfully and willfully "converted Plaintiff's furniture to their own dominion and control" which constitutes a "theft" under California law. *See Pacific Marine Center, Inc. v. Philadelphia Indem. Ins. Co.*, 2016 WL 8730668 (E.D. Cal. 2016). In *Pacific Marine*, the court cited Cal. Pen. Code §484(a) and held: "The California Penal Code defines theft broadly, and generically includes the taking of another's property.... 'A felonious "taking" occurs ... when the offender secures dominion and control over the property.' *Barnett*, 200 Cal. App. 4th at 544 (citing *People v. Duran*, 88 Cal.App.4th 1371, 1377 (2001)."

CDS' misappropriation of the Rubin's property and the improper exercise of dominion and control by CDS of property that CDS knew it did not own nor have any claim of right to possess, is directly contrary to the claim by Underwriter's in its June 14 letter that: "the specified peril of Theft does not exist based upon the allegations of the Complaint." In fact, the exact opposite is true. Based upon the testimony, discovery and the allegations of Mrs. Rubin's complaint, a jury could

reasonably conclude that CDS likely acted in a manner consistent with "theft" as set out in California Penal Code §484(a).

According to Black's Law Dictionary, "conversion" is defined as "the wrongful possession or disposition of another's property as if it were one's own; an acts or series of acts of willful interference, without lawful justification, with an item of property in a manner inconsistent with another's right, whereby that other person is deprived of the use and possession of the property." That definition is wholly consistent with the definition of theft set out in California Penal Code §484(a).

In a case involving nearly identical policy language; *i.e.*, "Theft, including attempted theft and loss of property from a known location when it is likely that the property has been stolen," the court held *In Perry v. Farm Bureau Mut. Ins. Co. of Idaho*, 130 Idaho 100, 936 P.2d 1342 (1997) that "conversion, though not specifically designated a crime in Idaho, has traditionally been recognized as a form of larceny. Current criminal statutes provide that 'a person commits theft when he knowingly takes or exercises unauthorized control over, or makes an unauthorized transfer of an interest in, the property of another person, with the intent of depriving the owner thereof.... Clearly, the language of the statute corresponds to the tort of conversion in Idaho civil law, which tort has been defined as dominion over chattels by a person not the owner, in a manner inconsistent with the rights of the owner."

Additionally, the Rubin's explanation that theft is the more likely cause of the loss of their furnishings than any other cause is wholly consistent with CDS' established business practice of stealing money from the Rubin's by charging amounts on Stuart Rubin's credit card without permission or authorization:

- By email dated September 30, 2015, Glen Posey advised Annette Rubin for the first time that CDS believed the March, April, July and August 2015 storage invoices were past due and Mr. Posey demanded immediate payment or CDS would cease any and all work to locate, release or deliver the items stored by the Rubins. (*See* Exhibit 2 to Annette Rubin's depo.)

- That same day, Mrs. Rubin's assistant responded to Mr. Posey indicating that he had failed to attach any of the disputed invoices.

- A few days later, in early October 2015, Stuart Rubin received a call from Glen Posey demanding payment in the amount of $7,500. (Stuart Rubin Depo. at 26:1-22; 30:1-16.)

- Mr. Rubin disputed the claim that any storage fees were delinquent or owed. (*Id.*)

- Despite expressly advising Mr. Posey that Mr. Rubin did not "believe that [CDS was] owed the money," Mr. Rubin nevertheless agreed to split the charges and authorized CDS to charge his credit card in the amount of $3,780. (*See* Exhibit 6 to Annette Rubin's depo.)

- That was the one and only authorization the Rubin's ever provided to CDS with respect to storage charges purportedly incurred between April and October 2015.

- No subsequent credit card authorizations were ever requested or provided.

Despite having never requested or secured permission or authorization from the Rubins to charge any additional amounts above and beyond the single $3,780 charge Stuart Rubin expressly authorized in October 2015, CDS fraudulently attempted to charge an additional $5,000 on Mr. Rubin's credit card for three additional invoices (presumably for November and December 2015 and January 2016) which CDS claimed were purportedly "related to deliveries made to the Alpine residence. (*See* Exhibit 6 to Annette Rubin's depo.)

By email dated January 28, 2016 to the Rubins, Mr. Posey claimed that the new charges "were authorized by [the Rubins] for work performed ... as per the agreement between Mr. Rubin and me." Mr. Posey made this misrepresentation despite having been specifically advised that the October 2015 accommodation made by Stuart Rubin was a one-time agreement. That same day, Annette Rubin responded to Mr. Posey's January 28 email detailing the failures of CDS including, without limitation:

- "We [now] know that your attempts to delay delivery of our furniture was due to the fact that you were well aware furniture/contents had been lost, damage, and our [sic] misplaced."[2]

- "We have receipts of all purchases made from Ralph Lauren and Minotti [and delivered] to your facility and yet you claim you do not have them and/or lost them."

- "We have not received a single response in writing from CDS since NOVEMBER 2015 nor call from you to address our lost and damaged personal property that has been in CDS possession for over 7 years and has never been delivered."

(*See* Exhibit 6 to Annette Rubin's depo.) In her January 28 email, Mrs. Rubin also stated: "We will turn the matter over to our legal representatives and seek all legal remedies available to us under the law if you continue to ignore our emails, calls, and demands to deal without our missing/damaged furniture and property."

Mrs. Rubin's reference to pursuing legal remedies apparently got CDS' attention because the next morning Mr. Posey emailed Mrs. Rubin and stated that "there's no need for this to escalate." In that email, Mr. Posey requested that they "resolve these issues in a way which is both timely and mutually beneficial to both of us." Mr. Posey never disputed that numerous items could not be located by CDS or delivered to the Rubins but, instead, he simply indicated that, with respect to "missing goods, ... CDS is fully insured and I have no problem with properly filing claims for cause." (*Id.*) Thereafter, Mrs. Rubin's assistant emailed Mr. Posey and advised him that CDS' claim that it was authorized to attempt to make any charges to the credit card beyond the $3,780 authorized in October 2015 was false stating that she knew "for a fact" that the post-October 2015 charge attempts were not authorized by the Rubins or their assistant.

---

2 At the time Mrs. Rubin drafted her January 28 email she remained hopeful that her furnishings had, in fact, simply been improperly inventoried and that she would ultimately receive all of the items she had stored at CDS. The full extent of CDS' improprieties was not yet known nor did Mrs. Rubin know that her items would never be "found."

were owed or warranted and, in response, Mr. Posey threatened that, if the disputed storage fees were not immediately paid, CDS would not allow the Rubin's access to their property.[1] In other words, CDS made what amounted to a ransom demand:

- [BY MR. RUBIN]: "He [Glen Posey] told me his business is in a cash crunch. It's failing. He needed the money, if I could help him out." (Stuart Rubin Depo. at 26:14-16; emphasis added.)

- [BY MR. RUBIN]: "So [Mr. Posey] had told me -- he said, 'We need the money, we're having financial problems. We have to move, see the new location, business is not good' and 'Can you help us out?'" (*Id.* at 30:2-14; emphasis added.)

As an accommodation, Plaintiff Stuart Rubin agreed to pay for one-half of the disputed storage fees and asked that the items be immediately delivered to the Rubins but that, of course, never occurred. Mr. Rubin offered to send his own trucks to the CDS storage facility to pick up the items the Rubins were storing there but Mr. Posey refused that expedited process.

Thereafter, Mr. Posey advised Mr. Rubin that CDS was moving storage locations and the company was moving all of the stored items from Culver City to Gardena. The Rubins never agreed to such a move and, given the proximity of Culver City to the Rubins, it made absolutely no sense for CDS to move the Rubins' items in a multi-stage/multi-step process from Culver City to Gardena and then to the Rubins rather than directly to the Rubins. Based upon Mr. Posey's announcement that CDS was moving the Rubins' items from Culver City to Gardena, it appears that the items may still have been in the possession of CDS at the time. Between November 2015 and January 2016, CDS delivered some furniture to the Rubins, but over 150 items were either never delivered to the Rubins or they were so damaged as to constitute a total loss.

During his deposition, Mr. Rubin repeatedly testified about CDS' admissions regarding its woeful financial condition. Those admissions, combined with the inability of CDS to deliver to the Rubin's thousands of pounds of brand new and one-of-a-kind items, logically support the inescapable conclusion that because (1) CDS was in desperate need of money, (2) the storage facility had in its possession, but had no right to title, to over 150 pieces of brand new or highly collectible items that were bubble wrapped and easily sellable, and (3) the items had been stored but never recovered for several years, a jury could reasonably conclude that it is more likely that CDS sold or exchanged the brand new furnishings to cover some of its mounting debt rather than any alternative explanation.

- [BY MR. RUBIN]: "We were paid up through April. And this blood money that he wanted from me to get my furniture -- from me in order for me to get my furniture. And I felt bad for him because of his financial plight, and I gave him the money.... He needed the money and I gave it to him." (*Id.* at 32:19 to 33:1; emphasis added);

---

[1] Through the lens of 20/20 hindsight, it now appears that Mr. Posey's demand to be paid $7,500 may well have been an attempt to support a later claim that CDS was entitled to dispose of the Rubins' property based on non-payment and, therefore, explain how the property had been lost.

In that email Mrs. Rubin's assistant went on to state:

[BY MRS. RUBIN]: "The only authorization that you had was in October [2015] when Mr. Rubin agreed to split the charges with you for $3,780.00 on 10/11/2015 and we provided you a credit card for those charges only. No other authorizations were given. CDS is not authorized to charge someone's credit card without their knowledge or approval."

(*See* Exhibit 6 to Annette Rubin's depo.)

Interestingly, the Subject Policy expressly equates the "unauthorized use of credit cards" as constituting a "theft" under the policy. *See*, Section E ("Additional Coverages"), Item No. 6 ("Credit Card, Electronic Fund Transfer Card Or Access Devise, Forgery And Counterfeit Money"), Sub-parts a. (1) and (2).

The undisputed and fraudulent attempts by CDS to charge a credit card without the express authorization or agreement from the Rubins for several invoices that were never provided to the Rubins is, in and of itself, evidence of not only a further theft by CDS but evidence of a business pattern and practice of the theft of personal property as well. Indeed, a reasonable inference arises that stealing or attempting to steal money or property of the Rubins was part of a business practice.

## IV. THE RUBINS DO NOT HAVE TO CONCLUSIVELY PROVE THAT A THEFT ACTUALLY TOOK PLACE TO TRIGGER COVERAGE

In interpreting nearly identical policy language to the covered theft peril described in the Subject Policy, the court in *Manopla v. Travelers Ins. Co.*, 525 N.Y.S.2d 997, 139 Mis.2d 30 (1988), expressly held that, under such a provision, the policyholder "is not required to produce evidence to show that the property was, in fact, stolen but rather proof to show that the loss was more likely than not caused by theft." (*Id.* at 998, 139 Mis.2d at 31; emphasis added.) Indeed, to succeed on its claim, the Rubins only have to offer sufficient evidence from which a jury may draw a reasonable inference that the loss was caused by theft. (*Id., citing Ruffalo's Truck Services, Inc. v. Nat'l Ben Franklin Co.*, Inc., 243 F.2d 949, 952 (2nd Cir. 1957) ("The testimony supports the finding of the jury that 35 bags of coffee were somehow removed from the plaintiff's trailer between the time of loading and the time of arrival at the premises of the consignee. Absent any evidence of destruction, authorized removal, or loss by falling from the trailer, it is a fair and indeed almost an inescapable inference that the bags were stolen." Emphasis added.)

Like here, the insurance policy at issue in *Hughes v. Nationwide Mutual Fire Ins. Co.*, 56 Va. Cir. 313 (Va. Cir. Ct. 2001), also covered loss against "'theft, including attempted theft' as well as '[l]oss of property from a known location when it is likely the property was stolen.'" In that case, the insureds lost two pieces of baggage checked on a Delta Airlines flight and the insurer denied coverage for the loss claiming that, much like Underwriters here, the items simply disappeared and, therefore, theft was not the likely cause of the loss. In rejecting the carrier's denial, the *Hughes* court concluded that the totality of the circumstances and testimony in that case:

"sugges[ed] that the luggage did not mysteriously disappear, but was more than likely stolen. Large expensive items do not logically disappear into thin air without explanation as to what happened; rather, large, expensive items are more likely stolen. *See Libralter Plastics, Inc. v. Chubb Group of Ins. Cos.*, 199 Mich.App. 482, 502 N.W.2d 742 (1993) (holding that an item's size, high value, and location are evidence of theft which renders summary judge for an insurer improper under a theft policy provision)."

(56 Va. Cir. 313 at *5; emphasis added.)[3]

In another case involving identical policy language to the Subject Policy, the Nebraska Supreme court in *Peterson v. Homesite Indemnity Co.*, 287 Neb. 48, 840 N.W.2d 885 (2013) was called upon to resolve an insurance coverage dispute arising out of a bailee's refusal to return thousands of pounds of household good entrusted to it until the homeowner paid additional money. The court in Peterson found that "in the absence of a provision specifically excluding conversion from theft coverage, [the] homeowner's insurance policy encompasses theft by conversion. The policy does not exclude conversion from theft coverage, and therefore, conversion falls within the broad definition of theft in [the homeowner's] policy."

The *Peterson* court also held:

- "Under a bailment, the person delivering the property for a specific purpose (the bailor) has 'the right to have the bailed property returned to him or her strictly in accordance with the terms of the bailment contract.' 8A Am.Jur.2d, supra, § 130 at 654."
- "If the bailee 'fails or refuses to return the property in the manner expressly required by the contract,' he or she 'may be liable for conversion, or for breach of contract.'"
- "Conversion is any unauthorized or wrongful act of dominion exerted over another's property which deprives the owner of his property permanently or for an indefinite period of time. *Brook Valley Ltd. Part. v. Mutual of Omaha Bank*, 285 Neb. 157, 825 N.W.2d 779 (2013)."

---

3 In *Hayward v. Employers Liability Assur. Corp.*, 214 Mo.App. 101, 257 S.W. 1083 (1924), the court concluded that there was sufficient evidence of the theft of a stock of liquors to justify the submission of whether such theft was covered under the insurance policy at issue. In that case, the policyholder's stock of liquors was intact at the time they were transferred from his club to his residence, the liquors were placed in locked storerooms and in closets, the loss of the liquors was discovered when the policyholder moved to another house and no one had consumed any of the liquor before the move. In discussing this case, one publication noted that mysterious disappearance cases usually involves "the loss of jewelry or personal property of a character which could very easily be accidentally misplaced or lost, whereas in the instant case the property was of such bulk and proportion that it could not easily be lost or misplaced." *See also, Burglary, Larceny, Theft or Robbery within Policy of Insurance*, 41 A.L.R. 846 (1926); emphasis added; *Fogel v. State Farm Gen. Ins. Co.*, No. 2D CIV. B268218, 2016 WL 6081779, at *1 (Cal. Ct. App. 10/18/16); *Minasian v. IDS Prop. Cas. Ins. Co.*, No. 14-CV-10125 (KBF), 2015 WL 8485257, at *4 (S.D.N.Y. 12/9/15), *aff'd*, 676 F.App'x 29 (2d Cir. 2017); *Pittman v. State Farm Fire & Cas. Co.*, 868 F.Supp.2d 1335, 1343 (M.D. Ala. 2012), *aff'd*, 519 F.App'x 656 (11th Cir. 2013).

Additionally, the *Peterson* court concluded "the fact that [the bailee] initially obtained possession of [the homeowner's] property with his consent does not preclude the possibility that they may have intended to convert the property for their own use. Because [the homeowner] delivered possession of his property to [the bailees] for a specific purpose, any actions by [the bailee] that were contrary to that purpose went beyond the scope of [the homeowner's] initial consent and could be a theft." Here, the Rubins voluntarily entrusted their personal belongings to CDS under a bailment agreement much like the homeowner in *Peterson*, but as the Nebraska Supreme Court correctly concluded, that original entrustment does not preclude the possibility that a jury could reasonably conclude that, at some later point in time, CDS fraudulently appropriated the property entrusted to them which constitutes a theft under California law. As a result, coverage for such theft is triggered under the Subject Policy.

## V. THE SINGLE CASE RELIED UPON BY UNDERWRITERS HAS ABSOLUTELY NO APPLICATION HERE

Underwriter's reliance on *Barnett v. State Farm Gen'l Ins. Co.,* 200 Cal.App.4th 536, 543 (2011) is completely misplaced for several reasons. First, the facts of *Barnett* are completely and easily distinguishable from the facts presented here. Second, every case that has discussed *Barnett* in connection with its "theft" holding has expressly limited its application to situations where, unlike here, the party accused of theft had a good faith belief that it had a legal right to possess the property taken. In this case, there exists no conceivable scenario under which CDS could have held any belief -- good faith or otherwise -- that it was the proper owner of the furnishings delivered to it for storage at any time, whether in 2007 or at any subsequent time. CDS was simply the bailee and, as such, it never possessed any ownership rights or any claim or right of title.

### A. *Barnett* Involved Wholly Distinguishable Facts

In *Barnett*, police officers from the Costa Mesa Police Department executed a validly issued search warrant at the residence of Greg Barnett and lawfully seized a dozen illegal marijuana plants from his backyard along with two freezer bags filled with illegal marijuana and a tray containing loose illegal marijuana and rolling papers.[4] Barnett was ultimately charged with possession and cultivation of marijuana arising out of the search and seizure. Before the criminal charges were filed, Barnett filed a petition t for the return of his marijuana. The superior court denied Barnett's petition. Two days later, the police destroyed Barnett's marijuana plants, rolling papers, and loose ounce of marijuana in a bulk narcotics burn. Several months later, the police also destroyed Barnett's freezer bags of marijuana in another narcotics burn.

Barnett sought insurance coverage for his loss under a State Farm issued homeowner's policy. In coverage litigation, State Farm filed a motion for summary judgment, which Barnett opposed. At the hearing, the trial court concluded that "even under the broadest definition of theft, the facts here do not establish that plaintiff's losses are covered." The court explained that "whether the warrant should or should not have ... issued is not viewed as dispositive, because once it existed, law enforcement

[4] The *Barnett* case involved a detailed description of the machinations of the convoluted criminal process and case which, for purposes of this letter, are wholly irrelevant.

personnel possessed ... facially valid authority to enter plaintiff's home and seize the marijuana." Here, CDS never had any authority, right or claim of ownership to the Rubin's property.

In granting State Farm's motion, the court in *Barnett* emphasized that, "Barnett's attempt to shift the analysis of whether a theft has occurred away from the moment of seizure to a later determination of whether *he* lawfully possessed his marijuana fails for four reasons. First, the insurance contract here identifies the covered peril *not* in terms of whether the homeowner's personal property possession is lawful, but rather in terms of an action ("theft") and, if the cause of the loss is uncertain, a probable action (the property was "stolen") committed by a third party." The seizure by police officers of the policyholder's marijuana at his home pursuant to a search warrant did not constitute a "theft" within the coverage of the homeowner's insurance policy because "the alleged wrongdoer acted under a bona fide claim of title [thereby] remov[ing] the criminal character from his or her act." Again, unlike the police officers in *Barnett*, CDS never had any authority, right or claim of ownership to the Rubin's property, nor did it possess a "bona fide claim of title" and, therefore, *Barnett* is wholly inapposite.

Notwithstanding Underwriters' contentions to the contrary, a jury here would not look at the criminal intent of CDS at the time of the original bailment to determine whether a theft occurred but, instead, a reasonable jury could find that such criminal intent existed at the time CDS decided to sell off or to trade the furnishing entrusted to it (without any rightful claim of title to such property) in order to offset its financial hardship.

B. CDS Has Absolutely No Arguable Claim of Title Here

The critical finding in *Barnett*, and one that has absolutely no application to the facts here, is that in that case, "the initial taking was not a criminal act because a claim of right dispels the criminal character necessary to constitute a theft within the common meaning of the word.... Stated simply, a claim of right to take disputed property negates the criminal intent necessary for theft." The *Barnett* court went on to note:

> "Simply put, the required criminal conduct to constitute a 'theft' under Barnett's homeowners policy resulting in a covered loss for 'stolen' property is missing under the circumstances here, where it is undisputed the officers seized the items pursuant to a search warrant and turned them over under proper police procedure for storage as evidence. An individual officer's subjective mental state becomes irrelevant when the return of confiscated items is committed, as here, to the legal process."

Every case that has cited the holdings in *Barnett* regarding whether a theft occurred, has focused on whether a claim of right negated the criminal intent necessary to find that a theft had taken place. For example, in *People v. Hussain*, 231 Cal.App.4th 261, 269, 179 Cal.Rptr.3d 679, 685 (2014), the court held that "the claim-of-right defense provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." Citation omitted). Here, there is no conceivable scenario or fact pattern under which CDS could have ever possibly held a good faith belief that it had a right to claim and dispose of the Rubins' property.

*Barnett* simply does not apply here because in that case, unlike here, the police possessed a valid and legally recognized claim of title to the illegal marijuana by virtual of a validly issued court order and, therefore, the seizure of that property was judicially sanctioned. Here, unlike in Barnett, CDS never had any legally recognized right to or even a remotely plausible belief that it had any right to claim title or possession of the property entrusted to it by the Rubins. On that basis alone, the case is wholly inapplicable.

## VI. THE "10% OF THE LIMIT OF LIABILITY" PROVISION RELIED UPON BY UNDERWRITERS DOES NOT APPLY HERE

Lloyds also incorrectly cites as potentially relevant paragraph 2 limiting coverage for personal property kept at another residence not the "residence premises" in this case; *i.e.*, the Alpine Drive home. This limitation reads as follows:

> "2. Limit for Property At Other Residences
>
> Our limit of liability for personal property usually located at an 'insureds' residence, other than the 'residence premises', is 10% of the limit of liability for Coverage C. or $1,000, whichever is greater. However, this limitation does not apply to personal property:
>
> a. Moved from the 'residence premises' because it is being repaired renovated or rebuilt and is not fit to live in or store property in; or
>
> b. In a newly acquired principal residence for 30 days from the time you begin to move the property there."

In this case this 10% limitation simply does not apply. First, the Subject Policy explicitly covers personal property "while it is anywhere in the world." Second, the quoted provision relied upon by Underwriters **only** applies to loss of "personal property usually located at an 'insureds' residence, other than the 'residence premises.'" Here, the vast majority of the items in question were never -- and certainly not "usually" -- located at any residence owned by the Rubins. Instead, they were shipped directly from the retailer to the CDS storage facility (or picked up by CDS) and those items were "usually located" at that storage facility for eight years. As a result, the relied upon limitation has no application here.

## VII. WHETHER OTHER POLICIES EXIST TO OFFSET ALL OR PART OF THE OBLIGATION OF LLOYD'S TO PAY 100% OF THE CLAIM IS IRRELEVANT

In previous correspondence and telephone conversations, you have inquired as to the status of claims submitted to other potentially available insurance policies issued by other carriers or under different Lloyd's policies that might apply to this loss. While the Rubins will continue to fully cooperate with Lloyd's in this regard, the existence of such other policies is wholly irrelevant to underwrtiters' obligation to pay this claim in full.

First, because this claim is clearly covered under the Subject Policy, the Rubins need not look any further than to those Underwriters subscribing to Certificate Number SRD526993 to pay 100% of the loss. If Underwriters can offset their contractual obligation to fully pay this claim by seeking reimbursement from other insurers, the Rubins will fully cooperate in those efforts but that does not diminish in any way, Underwriters' obligation to "pay and chase."

Second, it appears that Underwriters has already been provided with information regarding other insurance policies because, by email from you dated June 13, you stated: "we have sent tenders to AIG, Fireman's Fund and the other Certain Underwriters at Lloyd's, London subscribing to the other policy years between 2007 to 2015 for both the Santa Barbara and Beverly Hills homes." In that email, you also indicated that you had been contacted by coverage counsel for AIG. Additionally, in your letter dated July 14, 2017, you reiterate the fact that "on behalf of Underwriters, [you] have made tenders of the loss and provided documentation to various other insurers of the Rubins…." You further advise your insureds that you had taken it upon yourself to "continue to follow up with regard to other insurance for this claim and other insurers who may share in the risk." Consistent with those efforts and representations, the Rubins reiterate their offer to continue to fully cooperate in your efforts to offset their contractual obligation under the Subject Policy to fully pay this claim by seeking reimbursement from other insurers but, again, the Rubins look to the underwriters subscribing to the Subject Policy to pay 100% of the loss first and seek reimbursement later.

## VIII. CONCLUSION

As detailed more fully above, the Subject Policy clearly provides coverage for 100% of the replacement value of the stolen and damaged items. Accordingly, Underwriters should immediately acknowledge coverage for this loss and pay to the Rubins the full value of their stolen and damaged property. We look forward to working with you to obtain full and final payment by October 31 in order to resolve this claim as expeditiously as possible.

Very truly yours,

Richard C. Giller